IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

STEPHANIE JOHNSON                                                    PLAINTIFF

v.                              Case No. 4:24-cv-00898-LPR

PROTECH SOLUTIONS, *et al.*                                          DEFENDANTS

<u>ORDER</u>

On October 18, 2024, Plaintiff Stephanie Johnson filed this *pro se* action and sought leave to proceed *in forma pauperis*.[1]  Because she reports little income and no savings, her IFP motion is GRANTED.[2]  The law requires the Court to screen the Complaint.[3]  The Court must determine whether Ms. Johnson's Complaint is frivolous or malicious, fails to state a claim, or seeks monetary relief from a party immune to such relief.[4]  A *pro se* litigant's complaint must be construed liberally.[5]  Nonetheless, the complaint must "allege sufficient facts to support the claims advanced."[6]  Also, the Court must have jurisdiction to hear the case.[7]

I.      **Background**

Ms. Johnson, a former business analyst for Protech Solutions, Inc., brings this employment action under the Americans with Disabilities Act (ADA),[8] Title VII of the Civil Rights Act of

---

[1] Mot. for Leave to Proceed *in forma pauperis* (Doc. 1); Compl. (Doc. 2).

[2] Mot. for Leave to Proceed *in forma pauperis* (Doc. 1); *see Martin-Trigona v. Stewart*, 691 F.2d 856, 857 (8th Cir. 1982) (per curiam) (complaint can be filed if plaintiff qualifies by economic status under 28 U.S.C. § 1915(a)).

[3] 28 U.S.C. § 1915(e)(2).

[4] *Id.*; *Martin-Trigona*, 691 F.2d at 857.

[5] *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

[6] *Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004).

[7] *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.") (quoting *Ex Parte McCardle*, 74 U.S. 506, 514 (1868)).

[8] 42 U.S.C. § 12101 *et seq.*;  Compl. (Doc 2) at 3, 11.

1964,[9] and the Fair Labor Standards Act (FLSA).[10] She alleges that she was subjected to discrimination and retaliation during her employment.[11] In addition, she raises a state-law wrongful termination claim.[12] Ms. Johnson seeks $100,000 in damages.[13]

The factual background below is drawn from the operative Complaint.[14] At this stage, the Court must take all allegations of fact pled in the Complaint as true.[15] But the Court need not and should not accept as true (1) conclusions of law dressed up as fact allegations or (2) otherwise conclusory assertions.[16] Given these parameters, the applicability of the background section is limited to the instant screening Order.

Ms. Johnson began working as a business analyst for Protech in November 2022.[17] Protech is an "Indian-owned and Indian-run company with over 90% of the workforce being Indian."[18] Protech assigned Ms. Johnson to work on a project for the Arkansas Department of Workforce Services (ADWS), where she was instructed to "help support the current unemployment insurance website and to, to a lesser extent, provide support for the impending closure of the Pandemic Unemployment Assistance (PUA) website."[19]

---

[9] 42 U.S.C. § 2000e, *et seq*.; Compl. (Doc. 2) at 3.

[10] 29 U.S.C. § 201, *et seq*.; Compl. (Doc. 2) at 3.

[11] Compl. (Doc. 2) at 4.

[12] *Id*. at 13.

[13] *Id*. at 5.

[14] *See id*. at 11–13.

[15] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[16] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[17] Compl. (Doc. 2) at 11.

[18] *Id*.

[19] *Id*.

As the months progressed, Ms. Johnson noticed ADWS "trouble tickets" would sit in the "work queue untouched by the development staff for months."[20]  Ms. Johnson reported her concerns about the delayed tickets to the project manager, Kenneth French.[21]  Mr. French told Ms. Johnson that he had reported the developers' delays to their team leads without success.[22]  Mr. French said, "these are the people management wants in place."[23]  Ms. Johnson speculates that Mr. French meant that the owners of the company wanted Indian developers.[24]  But Ms. Johnson does not allege that Mr. French said this or said (or did) anything else to imply it.

Ms. Johnson maintains that she never witnessed any of the development team suffer any adverse consequences for their delays.[25]  She further adds that the developers were routinely allowed to return to India for months without workplace consequences.[26]  Mr. French told Ms. Johnson he would be fired if he were to deny any of the Indian coworkers' leave requests.[27]  Ms. Johnson speculates that Mr. French would not "suffer the same fate denying a non-Indian employee such an extended leave."[28]  But she does not allege anything to support this speculation.

On unknown dates, Ms. Johnson applied for (1) "a different [b]usiness [a]nalyst position" on another team, and (2) "a Customer Success Manager position."[29]  Her applications were initially

---

[20] *Id.*

[21] *Id.*  Ms. Johnson does not state Mr. French's nationality.

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

denied.[30]  Afterwards, she went to HR to let them know "what was going on and that work was not getting done by the Development staff . . . ."[31]  Her complaint eventually reached Nagaraj Garimalla, the company's owner.[32]  Mr. Garimalla "was not happy when he learned about what was going on, but [he] was thankful to [Ms. Johnson] for bringing it to someone's attention."[33]  Indeed, Mr. Garimalla "made [Ms. Johnson] Customer Success Manager for the team."[34]  Unfortunately, Ms. Johnson's stint as a Customer Success Manager only lasted a week, "because ADWS decided to terminate their contract with Protech."[35]  That (understandably) meant the reassignment of members of Protech's ADWS team.[36]

In July 2023, Protech reassigned Ms. Johnson to provide website support to the Arkansas Office of Child Support Enforcement (OCSE).[37]  The OCSE Project Manager, Claude Sutton, knew Ms. Johnson had no experience working with OCSE's operation software.[38]  He offered her no immediate training, even though she asked for it.[39]  When Ms. Johnson set up a training session with a coworker, Mr. Sutton cancelled it; he encouraged her instead to familiarize herself with the online procedure manual until a planned training session could be held "a few months from [then]."[40]

---

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *See id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.* at 12.

Ms. Johnson "did read a few sections" of the online manual.[41]  But "due to [her] reading comprehension disability," she "couldn't tell anyone about anything [she] read after [she] read it."[42]  Ms. Johnson does not allege that she told anyone about her self-described "reading comprehension disability."  Instead, it appears that Ms. Johnson just "limp[ed] along . . . writing and testing for a system [she] knew nothing about."[43]  Ms. Johnson "was really struggling to learn the system," especially because she wasn't getting "consistent work on a daily basis[.]"[44]  As to the work she did get, Ms. Johnson quickly completed her assigned work.[45]  But Mr. Sutton was unhappy with her work product and always edited it.[46]  Ms. Johnson complained about Mr. Sutton's edits to her team leader, Justin Beckham.[47]  Mr. Beckham told Ms. Johnson that Mr. Sutton did the same with Mr. Beckham's work.[48]

At some point during her tenure on the OCSE project, Ms. Johnson began noticing delays on customer-service tickets that were similar to the delays she experienced on the ADWS project.[49]  The "[d]evelopment team, all Indian, [were] letting trouble tickets sit out in the queue for months on end with nothing being done with them."[50]  And the development team would hardly ever

---

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.*

respond when she and others asked for status updates on the outstanding tickets.[51]  None of the developers were ever disciplined for their delays.[52]

At a different point during her tenure on the OCSE project, Ms. Johnson was assigned tasks that had already been completed by others.[53]  She was directed to write "worked with team to resolve issue" on her timesheets for those tasks.[54]  Rather than comply, Ms. Johnson instead wrote "time filler" in the spaces associated with those tasks on her timesheets.[55]  Mr. Beckham (the team lead) rejected her unapproved notations, reminding Ms. Johnson to instead write "worked with team to resolve issue."[56]  Mr. Beckham was worried that her "time filler" notation would show up in an audit if OCSE audited Protech's work.[57]

Subsequently, Ms. Johnson reached out to Francis Powell, the business analysts' manager.[58]  In that conversation, Ms. Johnson "brought . . . up" the fraudulent billing issue.[59]  Ms. Johnson also said the following: "I [don't] learn by reading; I learn by doing and am a hands-on learner."[60]  Ms. Johnson "didn't tell [Ms. Powell] outright that [she] had a slight learning disability . . . ."[61]  Nor does Ms. Johnson allege that Ms. Powell ever did or said anything to suggest

---

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.*

Ms. Powell knew Ms. Johnson had a learning disability.[62]  In any event, about a week after this meeting, on or about October 6, 2023, Mr. Beckham fired Ms. Johnson.[63]  He explained to her that she "wasn't catching on fast enough."[64]  But Ms. Johnson believes there was "another reason" Protech fired her: to hide its past and ongoing timesheet fraud from OSCE.[65]

In December of 2023, Ms. Johnson received a determination of her unemployment claim from the Arkansas Division of Workforce Services.[66]  In relevant part, that determination explained that (1) Ms. Johnson "was discharged . . . for failing to meet the employer's work standards," and (2) "[t]he employer has not provided sufficient evidence to support a finding that the claimant willfully disregarded [her] duties and obligations to the employer."[67]  Then, in late-July of 2024, Ms. Johnson received a right-to-sue letter from the EEOC.[68]  The instant lawsuit followed in mid-October of 2024.

## II.    Analysis

Ms. Johnson has failed to state viable claims under the ADA, Title VII, or the FLSA.[69] And considering this failure, the Court declines to exercise supplemental jurisdiction over any state law claims Ms. Johnson brings.

---

[62] Ms. Johnson does assert that her statement in the meeting "should have given [Ms. Powell] a clue" about Ms. Johnson's self-described disability.  *Id.*  But that assertion is a textbook definition of a legal conclusion that should be ignored by the Court.

[63] *Id.*

[64] *Id.*  Ms. Johnson does not state whether Mr. Sutton ever provided the training discussed in July before she was fired on October 6, 2023.

[65] *Id.*

[66] *Id.* at 13–14.

[67] *Id.* at 14.

[68] *Id.* at 6–7.

[69] Ms. Johnson's ADA and Title VII claims against the individual defendants also fail because liability under those statutes doesn't reach beyond the employer itself: here, Protech.  *Lenhardt v. Basic Institute of Tech., Inc.*, 55 F.3d 377, 380 (8th Cir. 1995) (Title VII); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8 (8th Cir. 1999) (ADA).

A.      ADA Claims

To state a viable claim under the ADA, Ms. Johnson must plead facts that make it plausible that some employment action Protech took with respect to Ms. Johnson was motivated in part by (1) her disability, (2) her request for a reasonable accommodation, or (3) her reporting of disability discrimination.[70]   Ms. Johnson has not done that.

First, Ms. Johnson does not plead facts to make it plausible that she has a qualifying disability.  A "disability" under the ADA is "a physical or mental impairment that substantially limits one or more major life activities of [an] individual."[71]   Even accepting as true that Ms. Johnson has a "slight learning disability,"[72] she has not pled any facts to plausibly show it substantially limited any of her "major life activities."[73]

Second, Ms. Johnson does not plead facts to make it plausible that anyone at Protech knew of her "slight learning disability."  Ms. Johnson never told anyone at Protech about it.  The closest Ms. Johnson comes to pleading otherwise is when she describes the conversation she had with

---

[70] A plaintiff does not have to plead facts establishing a prima facie case of disability discrimination at the motion-to-dismiss stage of the case.  *Cook v. George's, Inc.*, 952 F.3d 935, 939 (8th Cir. 2020).  Rather, the Complaint need only state a "facially plausible" claim.  *Id*. at 938.  "The elements of a successful ADA claim are, however, still 'part of the background against which a plausibility determination should be made.'"  *Id*. at 939 (quoting *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016).  Thus, to sufficiently state a disability discrimination claim, a plaintiff must (at minimum) plausibly allege that (1) she is a "qualified individual" with a disability "who, with or without reasonable accommodation, can perform the essential functions" of a job, and (2) her employer discriminated against her "on the basis of disability."  *Id*. (quoting 42 U.S.C. §§ 12111(8) & 12112(a)).  Prohibited discrimination under the ADA includes, as relevant here, "limiting, segregating, or classifying" an employee "in a way that adversely affects the opportunities or status of" the employee because of the employee's disability.  42 U.S.C. § 12112(b)(1).  It also includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . ."  *Id*. § 12112(b)(5)(A).  Whether a plaintiff must be able to prove that her disability was a "but-for cause" of, rather than a "motivating factor" for, the adverse employment action remains an open question in the Eighth Circuit.  *See Anderson v. KAR Global*, 78 F.4th 1031, 1039 n.1 (8th Cir. 2023) (declining to address the question).

[71] 42 U.S.C. § 12102(1).

[72] Compl. (Doc. 2) at 4.

[73] 42 U.S.C. § 12102(1).  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  *Id*. § 12102(2)(A).

Ms. Powell.  But saying you are a "hands on" learner and that you "learn by doing" as opposed to reading is a far cry from saying you have an ADA-qualifying disability.  It is just not plausible that anyone at Protech knew of Ms. Johnson's "slight learning disability."

Third, Ms. Johnson does not plead that she ever sought a reasonable accommodation or otherwise put Protech on notice of the need to engage in the interactive process.  And she does not plead that she ever complained of disability discrimination.  Her requests for training and her complaints that she did not receive training don't qualify.  Those are normal requests that employers receive from non-disabled employees all the time.  There was nothing that would have let Protech know these requests were actually *sub silentio* requests for a reasonable accommodation of a disability the company did not know about.

For the foregoing reasons, Ms. Johnson's ADA claims are dismissed.  Even if one assumes the work-expectations-related reason given for Ms. Johnson's termination was pretextual, there is nothing to plausibly suggest pretext *for disability discrimination*.  And Ms. Johnson doesn't suggest disability discrimination was a motivating factor as to any other employment action taken by Protech.

### B.   Title VII Claims

To state a viable claim under Title VII, Ms. Johnson must allege facts that make it plausible that some employment action Protech took with respect to Ms. Johnson was motivated in part by (1) Ms. Johnson's race, color, religion, sex, or national origin, or (2) Ms. Johnson's good-faith reporting of Title VII-protected discrimination.[74]  Ms. Johnson has not done that.

Ms. Johnson is not making discrimination claims concerning sex or religion.  As to race, color, or national origin, Ms. Johnson does not allege her race, color, or national origin.  She

---

[74] 42 U.S.C. § 2000e-2(a); 42 U.S.C. § 2000e-3(a).

doesn't even tell us that she is not Indian, although that is the fair implication of her Complaint. But let's put this problem aside. There are other reasons Ms. Johnson's claim cannot move forward.

To understand the problems with Ms. Johnson's Complaint, we must home in on what employment actions Ms. Johnson is alleging were motivated by discriminatory or retaliatory animus. Reading the Complaint very liberally, the Court can see only three employment actions that Ms. Johnson might non-frivolously complain about: (1) failing to select her for either of the two internal positions to which she applied while working on the ADWS team; (2) refusing to provide her training when she began working on the OSCE team; and (3) terminating her.

With respect to the failure to select Ms. Johnson for the two internal positions to which she applied while working on the ADWS team, there's nothing to make it plausible that she was rejected because she was not Indian. She doesn't allege a person of Indian nationality or descent got either of those positions. And although Ms. Johnson engages in rank speculation that "the company wanted Indian developers," these two positions were not on the development team.[75] There's likewise nothing to suggest retaliation for protected activity—because there's no allegation that Ms. Johnson engaged in any protected activity up to this point. Complaining that the development team—many of whom were Indian—were ignoring or delaying responses on hard tickets isn't protected activity for purposes of Title VII.

With respect to her supervisor's refusal to provide training when she began working on the OSCE team, there is nothing to suggest this had anything to do with her not being Indian. Ms. Johnson does not say that others were given any training that she was not. Indeed,

---

[75] The owner of the company ended up making Ms. Johnson a Customer Success Manager shortly after she was rejected for the position—apparently as a reward for reporting delays in addressing trouble tickets. In context, this makes the idea of discrimination or retaliation even more implausible.

Ms. Johnson does not point to a single similarly-situated employee and suggest that the employee was treated differently from her in any way.[76]  There is also nothing to suggest the training decision made by Ms. Johnson's supervisor was (in whole or in part) retaliation for protected activity.  As noted above, there's no allegation that Ms. Johnson engaged in any protected activity up to this point.  Even if one could somehow conclude that complaining about the development team's delay on tough tickets was protected activity, the result of her complaint was that the company owner gave Ms. Johnson a Customer Success Manager position (which is what she wanted) as a reward.  And there is nothing to suggest that Mr. Beckham or Mr. Sutton knew anything about these complaints.[77]

So, we come to the termination portion of Ms. Johnson's Title VII claims.  And here too, there is nothing to make plausible discrimination or retaliation.  Ms. Johnson was fired for substandard performance.  And Ms. Johnson admits she struggled to learn the system and that Mr. Sutton was routinely unhappy with her work product.  Given these admissions, it's next to impossible to make a plausible argument that the reason for her termination was pretextual.  But, even if such an argument could be made, there is nothing at all to suggest *pretext for discrimination or retaliation*.  Ms. Johnson doesn't suggest she was replaced by an Indian employee.  She doesn't suggest Indian business analysts similarly struggled but were kept on.  And, perhaps most importantly, she suggests that the real reason for her termination was to hide fraudulent billing practices.  That's bad, but it does not qualify as discrimination.

---

[76] To be sure, Ms. Johnson alleges that Protech did not discipline the developers (all Indian) for their delays in addressing help tickets.  But Ms. Johnson is not a developer.  Ms. Johnson also alleges that the Indian employees were allowed extended vacations.  But Ms. Johnson never asked for an extended vacation.

[77] Ms. Johnson mentions that her work was heavily edited by her project manager, Claude Sutton, but she does not state that the edits stemmed from a racial animus.  Whether other business analysts were treated similarly by Mr. Sutton is not known, but Ms. Johnson does allege that Mr. Sutton similarly edited her team leader's work.  In any event, Ms. Johnson has not alleged facts to suggest that she was singled out in any way by Mr. Sutton.

Nor does it qualify as retaliation for good-faith reporting of Title VII-related discrimination.  Indeed, there's no allegation of any such reporting up to this point.   To be clear, protected activity that could give rise to a Title VII retaliation claim "includes opposition to discriminatory employment practices prohibited under Title VII."[78]  The gist of Ms. Johnson's Complaint is that her team leader, Mr. Beckham, fired her after (1) she wrote "time filler" rather than "worked with team to resolve issue" on work that had been completed before it was assigned to her, and (2) reported the issue to another leader in the organization.[79]  This is not protected activity.  The Eighth Circuit has rejected Title VII retaliation claims "where the plaintiff opposed conduct other than a discriminatory employment practice."[80]

For the foregoing reasons, Ms. Johnson's Title VII retaliation claims are dismissed.

**C.     FLSA Claims**

The FLSA governs wage and hour issues.  Ms. Johnson does not allege any problems with her pay.  But perhaps she is trying to bring an FLSA retaliation claim.  A retaliation claim under the FLSA arises when an employee suffers an adverse employment action after participating in protected activity under the statute.[81]  A statutorily protected activity includes filing a complaint or beginning "any proceeding" related to the FLSA.[82]

Ms. Johnson brought her concerns about Protech's billing practices to the attention of her team leader, Mr. Beckham, by writing "time filler" on her assigned tasks.[83]  She then raised her

---

[78] *Warren v. Kemp*, 79 F.4th 967, 974 (8th Cir. 2023).

[79] Compl. (Doc. 2) at 12.

[80] *Warren*, 79 F.4th at 974.

[81] *Ritchie v. St. Louis Jewish Light*, 630 F.3d 713, 717 (8th Cir. 2011).

[82] 29 U.S.C. § 215(a)(3).

[83] Compl. (Doc. 2) at 12.

concerns to the business analyst manager, Ms. Powell.[84]  In short, Ms. Johnson believed that she had caught Protech double-billing OSCE for work already completed, complained to her supervisors, and was fired shortly afterward.  The problem for Ms. Johnson, however, is that she was not complaining to her supervisors about FLSA-related pay issues.  She was not complaining that Protech ever failed to pay her (or others) or threatened not to pay her (or others).  Her complaint was instead about how Protech billed OSCE, which is not an FLSA-related issue.  Bottom line: there are no allegations to make it plausible that Ms. Johnson engaged in protected activity under the FLSA.  So, she cannot possibly state a viable FLSA retaliation claim.

## IV.    Conclusion

The Court has already explained why none of the federal causes of action make it beyond screening.  In such a situation, absent unique circumstances not present here, the appropriate thing to do with any and all state-law claims (e.g., the wrongful discharge claim) is to decline supplemental jurisdiction over them.  The Court does so, and thus dismisses them without prejudice.

IT IS THEREFORE ORDERED that:

1.    Ms. Johnson's Motion for Leave to Proceed *in forma pauperis* (Doc. 1) is GRANTED.

2.    Ms. Johnson's Complaint (Doc. 2) is DISMISSED without prejudice for failure to state a claim upon which relief may be granted.

3.    Ms. Johnson's Motion for Permanent Injunction (Doc. 6) is DENIED as moot.

4.    The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an *in forma pauperis* appeal taken from this Order and the accompanying Judgment would not be taken in good faith.

---

[84] *Id.*

DATED this 24th day of June 2025.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE